versus Joseph E.C., and we have Mr. Ryan Connor for the appellant, and we have Ms. Thank you, Your Honor. Good morning. Your Honor, this is an appeal from a termination of parental rights cases for Father Joseph C. His parental rights were terminated under a number of provisions in the Adoption Act, allowing the state to terminate parental rights. Those grounds were abandonment, desertion, failure of the father to maintain a reasonable degree of interest, concern, or responsibility, and a failure by the father to make reasonable efforts within nine months of adjudication. The father was first adjudicated in April of 2010, April 15th of 2010. The case proceeded quickly. There was a stipulation to the adjudication. There was no argument of disposition that was, again, stipulated. There is a factual disparity between the state's brief and appellant's brief as to when exactly the service plan came into being. The state asserts that it was as early as July 19th, 2010. The appellant, from the review of the record, notes that the integrated assessment located in the court's record wasn't filed until August 4th, 2010, and was accompanied by a service plan at that time. While not necessarily briefed with regards to the filing of the integrated assessment, that's an important date in this record because often the service plan changes after the integrated assessment. There's a full investigation by the agency, whether that be DCFS or its contracted agency, in this case, Capital Social Services, to provide a service plan. And so this disparity in dates becomes important as we get into appellant's argument about the denial of due process and whether or not the state should have been required to proceed under different grounds. And when I say required to proceed, that's not necessarily what I mean. Whether or not other circumstances better fit or would have constituted a de facto denial of due process based upon the grounds preceded on by the state. That said, Your Honors, the first ground on which appellant proceeds on appeal is that he was denied due process based upon being an incarcerated person and facing the grounds preceded upon by the state for finding that he was unfit. Once again, those grounds are all found in the Adoption Act. And when the state chose to proceed, they chose to proceed on April 8th, 2011. Once again, that date is important because there was a hearing on April 7th, 2011. And at that time, the goal was changed to substitute care pending a determination of parental rights. And when that occurred in this case, there was testimony on April 7th, 2011. And the testimony all came from the caseworker in the matter. And the caseworker testified that no one knew where Joseph C. was. No one knew where the father had been. They had been able to contact him. He had not reached out to the agency, be that Catholic Social Services, or be that DCFS. So no one knew where to contact him. It turns out he had been incarcerated since January 28th, 2011. Despite the testimony, on April 7th, the next day, the state files a termination of parental rights petition. And they allege five grounds, actually including an additional ground other than those I listed, that being a failure to make reasonable progress within nine months of adjudication. Ultimately, the court did not make a finding as to the reasonable progress. The state specifically did not proceed under 750 ILCS 50-1 sub d paragraphs r or s, which specifically address incarcerated persons. They require when a respondent is, in this case, going to be in custody for two years, or when a person is going to or has been repeatedly in custody, such that they cannot discharge their parental duties, their parental rights can't be terminated. In this case, the state was aware not only of repeated incarceration, but in fact continuous incarceration of the father in this case since January 28th, 2011. They were aware of that as early as one day in advance of filing the petition for termination of parental rights. He remained in custody of Vaughan County Jail. The case proceeded, and ultimately the father's rights were terminated on the four grounds that I mentioned. No one, at any point in the record, making any assertion that anyone should have been required to proceed under grounds that contemplated the respondent's incarceration. To counsel's knowledge, the respondent remains incarcerated today. There's very little in the record about how long exactly the respondent is going to be gone. There's some speculation at the best interest hearing about how long he may be gone for, but there's never really a record developed as to what program he's entering, whether or not he's elect to treatment, whether he's a part of impact incarceration, the testimony as he goes to court came. So really no question that he was incarcerated. The question is how was due process denied him by failure to proceed on these grounds? Well, he wasn't the same as everyone else. He wasn't the same as everyone else in the termination of parental rights case. Interestingly, I find that the first two grounds, abandonment and desertion, require intent. And since those two grounds require intent, there's a line of cases that I've cited in my brief that speak to intent. They say, well, you have to have an intent to abandon, or desertion must be an intentional desertion, and that the incarceration is not an intentional act, such as to abandon your parental rights. Yet the court found that Mr. Curtis had abandoned his children. So when the father is incarcerated, whether or not he chose incarceration is sort of a non-secular. He ends up incarcerated, but he does not choose that as a route. Interestingly, we have abandonment and desertion. And desertion, just by the plain language of the statute, references adoption, references three months next preceding the adoption. Well, in this case, there has been no adoption. Obviously, we're still on appeal, but there's been no adoption process. It sort of boggles the mind how desertion could have occurred when adoption has not yet been contemplated. We remain with this idea that from the county jail, appellant completing the service plan from the county jail was an almost insurmountable hurdle, especially because no one even knew where to contact him. There's no evidence in the record about whether or not he was able to make a call out. There's no evidence about whether he had funds available to send a letter. It's the common threat analyzed by the cases. Did he send a letter? Did he make any contact? Did he make an effort to stay connected to the children? All require something more than he was able to do. By counsel's research, the cases have addressed this in the context of the Illinois Department of Corrections. So we find people that are getting on waiting lists to be in parenting classes or alcohol assessments, domestic violence assessments. He had none of that in the Bond County Jail. As far as the record goes, there's nothing there. There's no development of what he had available to him or what he could have done to attempt to comply with the DCFS service plan. In fact, the DCFS and our agents testified that there was one telephone call, one time, to attempt to figure out whether or not Mr. Curtis was still a phone number that they had for him, despite the fact that he was a probationer, despite the fact that he was in custody for four months leading up to the time the determination of parental rights petition was filed. It's a due process violation when you fail to take into account the circumstances of a given incarcerated individual, especially one who's previously been found by the court to be indigent, and then to say, well, you've now abandoned, deserved it, failed to maintain a reasonable degree of interest, care, and concern, and you've failed to make reasonable efforts as to your service plan. But by the way, we're not going to proceed against you in any fashion that contemplates your incarceration. The legislature clearly contemplated that some incarcerated persons would face termination of parental rights petitions. And in so doing, they have two provisions that accommodate that quite well. Neither of those were used here. In fact, the state merely bludgeoned Mr. Curtis with the idea that had he been a little bit more assertive in completing his service plan, perhaps his kids wouldn't be being taken away. Is this a case of first impression? By my research, Your Honor, it is. I'm aware of no case, and I did not see any cases in the state's brief that indicated to me that any case had contemplated what resources may be available in the county jail. I don't think the issue is an issue of first impression. Well, what I'm saying is you're saying that he was denied due process because they didn't plead under the two statutory provisions that relate to incarcerated parents. In fact, Your Honor, to answer your question candidly, no. The court has previously taken up cases where people's rights have been terminated under the other provisions, but I find no cases addressing the issue of what to do with an incarcerated person awaiting trial in the county jail. I guess, in my experience, these cases don't move that fast. This case moved at a very rapid pace to termination. He hadn't even been to trial yet on the ultimate issue. He ended up pleading and going to boot camp. However, from January 28th until April 8th, when the petition was filed, he had no access to services. DCFS didn't even stop by the jail to see if they could provide him with services or maybe some of those postcards and letters he could have sent out. There's no indication that he had any family available, and I apologize because this bleeds a bit into my argument about ineffective assistance of counsel. We just don't have much of a record on this. One of the state's arguments that I anticipate is that Mr. Curtis could have done a number of things while he was in custody. It's going to be an unreasonable burden to, in every case, force the state. There's going to be some sort of prosecutorial discretion argument that forcing the state into one box or another would be unduly burdensome. Well, that bleeds into my ineffective assistance argument because this could have been litigated at the very first instance. This could have been litigated on April 8th when the petition was filed, a counterpetition or an objection could have been filed saying we can't possibly comply with abandonment, desertion, reasonable degree of interest, reasonable efforts, and reasonable progress. We can't fight that fight because this individual is incarcerated, has been for some time, or has at least been repeatedly incarcerated such that he cannot discharge his criminal duties. That doesn't seem to be a terribly onerous burden to require that pleading litigation to occur in the first instance. In my analysis of the case, that's where this should have happened. This should have happened at the pleading stage, but unfortunately the case proceeded from October 18th, 2010, when the court entered a permanency hearing and said we'll set it for review in April, and nobody had contact with Joseph Curtis in between. They merely waited him out and then testified later, well, we didn't know how to get a hold of him. And the judge, you know, and the guardian ad litem at the hearing find in the record that they make this pronouncement that, well, had you done a little bit more, had you worked a little bit harder, perhaps you wouldn't be in this mess. Or if you hadn't chosen to get yourself thrown in jail, you wouldn't be in this mess. But there were two provisions that contemplated Mr. Curtis's mess, and those two were specifically ignored in favor of those that best fit the state's idea of how to terminate Mr. Curtis's criminal rights. And as I said, I find it interesting that those that require intent are front and center in this grouping. I'd like to ensure that I make an argument about the fact that this court should find that it was against the manifest way to the evidence to find that Mr. Curtis was unfit based upon all of the factors, but I'd like to specifically address the idea that he did not maintain a reasonable degree of interest, concern, or responsibility. And once again, he was specifically unable to based upon official frustration. There's quite a bit of official frustration in Mr. Curtis's way. He has a Kentucky court that's told him he's no longer allowed to visit his children. Then he's got an Illinois court that tells him had he visited his children, perhaps he would have been able to retain any of his criminal rights. He has two agencies, the Department of Children and Family Services and Catholic Social Services, who were attempted to be held in contempt by a rule to show cause issued by the circuit court. Clearly, the court was frustrated with the procedure in the case. Something was not being done correctly from the perspective of the agencies that were called. Mr. Curtis couldn't visit his children, and his service plan wasn't being completed by the caseworker's account because they didn't think they had to because he was incarcerated. And he couldn't visit with the children, so it didn't have any impact on what they were doing to hold on to the children. That manifestly is the way that the evidence to find that he has specifically abandoned, deserted, or failed to maintain a reasonable level of interest or degree of care and concern. No one bothered to find out, and certainly he would have been able to manifest those in some way. But as I said, he's indigent, and he's held at the Bond County Jail. The absence of a finding. The state did plead the grounds of no reasonable progress within nine months of adjudication, but the absence of a court's adoption of that ground for termination is telling in this case. Reasonable efforts and reasonable progress are two sticks by which we could measure Mr. Curtis' progress within the nine months following adjudication. Reasonable efforts being the subjective stick. Reasonable progress being the objective stick. Mr. Curtis, measured by the subjective stick, has to have a very low burden here because he was in custody admittedly. Not the entire time that he was supposed to be working to get his kids back. Not since disposition, but at least since very close in time following the entry of a permanency review and the updating of the service plan, that being October 18, 2010. He was incarcerated just a couple of months later. The court specifically doesn't find him unfit based upon the objective stick. They find him unfit based upon the subjective stick because he didn't visit the child, because he didn't show any interest or concern. All the things that he couldn't do from the bond county jail. So for that four months that precedes the filing of the termination petition, the court has no idea what Mr. Curtis is doing or thinking or what efforts he'd like to put forward. All they know is that DCFS and Catholic Social Services could not make an effort to get to him. They did make a phone call, but that was it. They didn't even bother to go by and get the records of any counseling that he had been completing from before his incarceration. As I said, Your Honors, this all contributes to my assertion that trial counsel was ineffective for a couple of reasons. Failing to develop the record adequately as to Mr. Curtis's incarceration. Had there been some recitation of the litany of incarceration that Mr. Curtis had suffered during this, the court could have had a better basis as far as the facts that led up to the termination. But again, this all could have been resolved at a hearing in the first instance had someone stepped forward and said, well, this individual will never be able to meet these criteria of abandonment, desertion, maintaining a reasonable degree of interest and concern, or making reasonable efforts because of his incarceration. At that point in time, the court could have considered whether or not to strike the state's petition or deny the state's petition, and the state could have reclaimed and said, well, we'll proceed on the grounds that you contemplate incarceration. Otherwise, a collateral consequence of incarceration for indigent individuals will be to lose their children. If they're incarcerated, even awaiting trial, they will lose their children, unless they have the money to buy stamps from the commissary or make phone calls out of the jail, which logistically presents problems for them. At this time, we ask that this court remain on the issue to allow the state to proceed on the grounds that do contemplate Mr. Curtis's incarceration, to allow him to have a hearing on whether or not he'd be incarcerated for two years or whether or not his repeated incarceration has so impaired his criminal duties such that he cannot discharge them. And maybe you've already said this, but when is he due to be released? Given that it's boot camp incarceration, Your Honor, I am not positive. I believe the only evidence this court has comes in the state's brief. The state does provide his – it's a printout from the Illinois Department of Corrections. And what does it say? It gives a projected parole date of June of 2013 – pardon me, July 26, 2013. Thank you, Mr. Conley. Thank you, Your Honor. And you'll have the opportunity for rebuttal. Thank you. Ms. McCormick? Context is all important in this case, and this court needs to hear a little context. And I don't want to belabor it, but from the beginning of the mother's relationship with the father, it was abusive. He beat her, she said, at least every two weeks. The order of protection was issued in Kentucky, and it was after the birth of their first child, JEC. She was holding JEC, and the father – and she was eight weeks pregnant with EC, and the father beat her, grabbed her while she was holding the child, drug her down a gravel driveway, pulled her by the hair. Ms. McCormick, you know, I agree there's some pretty horrific facts in there. Right. But if even considering those facts, the court put in place a plan, and he's not able to accomplish any of those goals, how does that play out? No, no. The visitation with the children was never part of the plan. It was never part, because he was legally prohibited from visiting with the children because of the order of protection. The court was well aware of this, and so were the social services that dealt with the father. That was never part of the plan. What was part of the plan were the things that he could work on, which was dealing with his mental health problems, with his substance abuse problems, with his anger problems, with his domestic violence problems, with his being able to parent, the parenting classes, those kinds of things. And the father was not continually incarcerated during those periods of time. But let me back up to one. The feedings that you referred to, did they support a specific element or a specific, I don't know, it wouldn't be element, cause for the termination of parental rights, you pled desertion, abandonment, failure to, does that criminal conduct or conduct of his support anyone in particular? Yes, they show his intent. Intent to what? Yeah, and it shows his lack of a reasonable degree of interest in his care and concern. And it goes to the last ground that the court found is limited to a nine month period after the adjudication. So three, I'm sorry, five of the six grounds, because the reasonable degree has really three grounds underneath it. Those are not limited by any time period. So you can look at the whole context and that's why, yes, all of this is pertinent to it. And it's pertinent even before there was a service plan in place. It's pertinent to these grounds of unfitness. Now, lack of cooperation with the service plan is some, it can show some, it is some proof of some of the conditions for unfitness under the three grounds. And also under the nine month ground, the first nine month after adjudication, yes. And it's particularly perverse to rely on the fact of his incarceration as being some sort of excuse or amelioration of his intent. It's particularly perverse because the very conditions that caused the children to come into care were the fact that he was beating the mother in the children's presence and it was an injurious environment. And he continued to beat the mother after the order of protection for which he has two convictions for violating that order of protection. Did they occur within that nine month period also? No, not always, no. Not always or not? No, no, not at all. The convictions were prior to the nine month period. But then he also has another conviction for conveying a threat by electronic means to the mother's boyfriend to kill him. Okay, so he has three convictions. But two of them are particularly indicative of his intent. Instead of making any effort to go back and ameliorate, he makes an effort to go the opposite direction, which is to continue to beat the mother, to continue to violate the order of protection. And his incarceration now, what does that relate to? His incarceration now is for two violations of the order of protection and also the conveying of a threat to kill by electronic means. Yes. Now, that's the context and that's why it's important. He's the reason why he's incarcerated. It's his intent to continue to batter the mother and to go 180 degrees away from even beginning to comply with the service plan while he was out of jail because he was. The order of protection was entered in Kentucky. He was arrested December 16th for battering the mother again. This time she was seven months pregnant and he threw her down a flight of stairs and she went into premature labor. That was 2010? Huh? What year was that, December 16th? He was arrested December 16th, 2009. And he was in jail. This is the first violation of the order of protection after they moved back to Illinois. He was in jail from December 16th, 2009 to January 14th, 2010, and he was given probation. He had a chance to start to work on these service plans. Now, there may not have been a service plan in effect right then, but he was given a note, and he acknowledges this is an open court, about what things he was going to have to do in advance of getting a service plan. He already knew the things. And many times in court his counsel gets in and says, yes, we've gone over the service plan, and he understands that he has to cooperate with probation. He has to cooperate with these service plans. So there's no doubt that he knew. And also the court admonishes him in open court early on what he has to do to get the children back. The only thing he does is he does comply with paternity testing, and the only other thing he did was get a domestic violence evaluation in some classes. But that was it. And he wasn't precluded from doing these things entirely because he was on probation from January 14th. Then he was arrested again in May of 2010. He was put back in jail until sometime in August of 2010. And I will agree, teasing out these dates is a little tedious, and it's not exactly easy to pinpoint. We sort of have ballpark figures because it's really not a very good record about his periods of imprisonment. But we do know that he was on probation between January 14th, 2010, and sometime in May. Then we know that he was released again on October 13th of 2010 and was out and living with the mother again in November 2010. When he's in custody, May to August, we think. Is that in Illinois or Kentucky? It's in Illinois. It's in Illinois. No, the violations of the order of protection and the enforcement of the order of protection was in Illinois because they moved to avoid complying with the mother wanting to still live with this person. So that's the context. He was back in jail on January 28th, 2011, and charged with intimidation? No, that's after the conviction. He was transferred to the Department of Corrections on January 26th, 2011. Oh, so he had been convicted and transferred to the Illinois Department of Corrections. Right. He had two convictions for the violation of the order of protection for doing serious acts in violation of it and then also he was convicted of the transmission of threats to kill. So there were three things. He's not doing, you know, it is just perverse to complain about his imprisonment when his imprisonment is the result of his not even trying to comply with the service plan, not even making any effort to, but instead continuing on the same course that brought these children into care, which was domestic violence, beating the mother in the presence of the children, even when she's holding one of the children. So let's get back to what due process violations did this man suffer because the state didn't allege certain particular grounds that involve incarceration. Well, there aren't any degrees of unfitness. Unfitness is unfitness. They are just different grounds. And the state had the burden to prove that and meet that burden of proof, and they did so, but not for the grounds the father wants to pick. Now, he doesn't complain that he didn't get noticed and he didn't get a fair hearing and that he didn't have counsel. He had all of those things. He was afforded full procedural and substantive due process. He just wasn't, the state just simply did not allege grounds that he thinks should have been alleged. So I find it a little strange to try to figure out. He's like a defendant saying, well, I could have been convicted of such and such if you had charged it, but you didn't, so I'm deprived of due process. I'm sorry, this doesn't make any sense to me. But, you know, he doesn't really show that the state could approve any of the grounds under Section 1DR or 1DS, but let's just assume that the state could have made, could approve those. What due process violation is there that would have been two more grounds? I'm sorry, what due process? Why don't we assume they can't prove it? They can't evaluate it that way. But if they couldn't prove it and the state knew that, they couldn't allege it would have been unethical to do so. So the father can't, you know, it's like letting a defendant, you know, tell a prosecutor what charges he must charge. It simply makes no sense because it is the ethical duty of the state's attorney to allege those grounds that he has good faith to prove. And the father can't be allowed to pick and choose what grounds he ought to have to prove. I mean, if he couldn't prove it, he couldn't allege it ethically. If he could prove it but didn't allege it, what due process violation is there? If he could approve those grounds in addition to the other six grounds, what due process violation is there? It simply makes no sense to me. And I ask this Court to reject this due process argument. Now. With your hypothetical, if you could have proven it, does the state get some of it? I don't have it in front of me, the statute. But if you're incarcerated, what is it, three times with a certain number of years or in excess of two years, is that a presumption or is it? R says the child has to be in temporary custody when the petition for termination of parental rights is filed. And the state must show that prior to incarceration, the parent had little or no contact with the child or provided little or no support for the child. And the parent's incarceration will prevent the parent from discharging his or her parental responsibilities for a period in excess of two years after the filing of the petition. So perhaps they could have proved it. Perhaps they couldn't have proved it. But if they could have proved it, but they didn't allege it, what due process violation is there? And S requires that the child be in temporary custody. And the parent must be incarcerated as a result of criminal convictions at the time the motion for termination is filed. The parent has been repeatedly incarcerated as a result of criminal convictions. I don't know that he has been. And the parent's repeated incarceration has prevented the parents from discharging his or her responsibilities. Perhaps they could have proved it. Perhaps they couldn't. But this defendant, I mean, the father here suffered no due process violation because they didn't allege grounds they could or couldn't prove. He would have suffered a due process violation if he hadn't been given counsel, if he hadn't been given notice, if there had been some false evidence in support of the grounds that the court did find it. None of those things happened. He's just saying, well, you should have alleged these two. But that doesn't result in a due process violation. Well, the first ground that the court found was abandonment. And that requires a settled purpose to forego all parental responsibilities or duties and abandonment of all parental claims to the child. Now, there's no time limit on that. You can go back to the beginning of when the child was born and look at the parent's behavior to see if he ever showed that intent. And I think the record is clear that he did show that intent. He showed that intent by beginning to beat the mother while she was holding the child, by pushing the mother down steps and by beating her and dragging her down driveways when she was pregnant with E.C. If that doesn't show an intent to abandon, it certainly shows an intent to destroy that child because that child, they didn't hear a fetal heartbeat for some time and the child was born with problems. That certainly shows an intent to abandon and to forego. And he didn't, you know, another thing you can look at is the fact that he never supported the children. In fact, he depended on his own mother for support and he lived off of the mother of his children. And he spent his time playing war games on video games, Warcraft, I'm sorry. So, you know, he just basically existed as a parasite. He didn't show anything that would negate an intent to abandon these two children. And then you can look at the history after that. He continues to violate the order of protection. He continues to beat the mother regularly and the abuse gets worse after E.C. is born. He kicked the mother in the abdomen where her incision was from her C-section. He spat in E.C.'s face when E.C. was about one or two months old. Now, that shows to me an intent, all of this evidence shows an intent to abandon these two children because all of his efforts are toward doing something that's going to land him in jail or a violation of an order of protection that's highly foreseeable. And this shows an intent to abandon foregoings, parental duties, and relinquish all parental claims. I think that his behavior, it clearly shows that. And there's a sort of a lesser proof for desertion because it doesn't, it is conduct, indicating an intention to permanently terminate custody over a child. Well, it certainly shows that because these children are in care because of his actions and his intention. But while not relinquishing all parental rights. So, surely if it shows abandonment, it certainly shows, his behavior certainly shows an intent to desert. Then there's the failure to show a reasonable degree of interest, concern, or responsibility. These are each three different grounds subsumed under that one section. And there is no time limit on this ground either. The only time limit this court has to look, time frame limit, is the one that is the first nine months after the adjudication ground, which has to do with reasonable efforts. Without going over all the facts, again, you know, you could find that this was his actions in continuing to beat the mother and in continuing twice to have a conviction for a violation of the order of protection and continuing to do criminal acts like threaten the mother's boyfriend with death. And there's that, that's the moving away from, but then there's also the total lack of any reasonable efforts to comply with the service plans that were in effect during this time period. He makes no effort to contact the case workers, although the record shows he was repeatedly given their card and told and urged to contact them. The only time he does contact them is when the mother is wanting to go to Kentucky to persuade the court to lift the order of protection. And they do send a letter, and that's the only time he ever contacted them. Do you think the state was obligated to put on evidence that he had the ability to do this while he was incarcerated? Well, he wasn't incarcerated the whole time. It's limited to the time when he's incarcerated. No, I don't, because he had time where he could have. I mean, do you have to show that he could have made a phone call or he had access to this? Is there any, is there an obligation? He's saying you didn't put on any evidence of that and that was your obligation. What's your thoughts? Well, my answer to that is it's like the man who killed his parents and throws himself on the mercy of the court for being an orphan. He's saying, well, you have a duty to hunt me up after I intentionally violated the order of protection and ended up in jail. It's perverse. No, he was given cards and he was given, and he knew, he knew the service plan, he knew what he was supposed to do. So you say it's his burden to show that he could not have done it, not for you to show that he could have done it, that he had the ability to do these things. Well, even if you take those few months out when he was actually incarcerated and don't count them against him, look at the times where he was out of jail, when he could have cooperated, when he could have contacted. Do you have nine months if we don't include it? Is one of your bases for termination that during the nine-month period he did not make progress? And if we exclude the part when he's incarcerated, would you have it? Okay. The children were adjudicated on April 15th, and he was on probation at that point in time. He was jailed on May 2010 to August 2010. So, you know, during that period of time perhaps he couldn't make a phone call. So you're looking at the nine-month period following? Yes, I'm looking at the nine-month period. After April 15th. So then he was released in October 2010. And it's murky when he came back into custody after that, but we do know that he was sentenced and sent to the Department of Corrections on January 26th, 2011. But there were times in there where he could have, during that nine-month period, made some contact and made some effort, and he makes none. Thank you, Ms. McCormick. Mr. Connor, do you have a rebuttal? Your Honor, one thing that is key to this court's determination of the due process violation is where the respondent was incarcerated from January 26th, 2011, until the filing of the parental rights termination petition and ultimately the hearing. The record is certainly unclear. I'm going to ball the Court's attention to page 249 of the record. There's a discussion about where the respondent is getting ready to go. He's getting ready to go to boot camp. My impression from the record is that he was in custody of the Bond County Jail. Certainly the Department of Corrections lists his custody date as the date he actually came into custody. I believe that is the date he came into custody in Bond County, not the date he was actually sentenced. He was not in custody in advance of that January date. We have no evidence in the record of that. If he's in custody in the Department of Corrections, we are in a different line of cases. That's a line of cases that he's going to have to get in line to get services and perhaps be able to send letters and maybe he can take parenting classes. He's offered a different array of services in the Department of Corrections than he is in the Bond County Jail. I apologize that the record doesn't give me more certitude to argue to this Court. I would say that's determinative of the issue.  So if he was in the Department of Corrections on January 28, 2011, then you believe he's in Bond County? I believe so, Your Honor. And if he's in the Department of Corrections, that hurts your argument? It certainly would. The problem being, Your Honor, that this Court had, pardon me, there is a line of cases. I've cited Gwynne P. That's a First District case from 2004 addressing the impact of incarceration. Now, again, we don't have a record to tell us what may have been available to this particular incarcerated individual in whatever facility he was in. So I don't have any information from the record. But I would still allege the trial counsel has been affected for not pursuing that route or attack the Court's judgment based upon a failure to make any finding of what services. The State didn't put on any evidence as to what services may or may not have been available to this defendant as of the date he was brought into custody. I probably missed this, but they've got his admission date as May 18, 2011. And I would be much more online with that. That's right at the time the termination hearing takes place. And you'll see in the record the transcript the judge and counsel are discussing when he's going to, quote, go to boot camp. He's getting ready to leave, to go to the Department of Corrections. He's going to go to the White House, or he's going to go to the facility where he's going to serve out his boot camp sentence. There's speculation. None of the parties know how long he's going to be gone and when he's coming back. And that, Your Honors, is why the State didn't. I'm speculating a bit here, but the State didn't know how long he was going to be gone, so they only have two years. So they know that they can't terminate him on the two-year ground. Or if they do, they don't know whether – if he doesn't successfully complete boot camp, he might be gone within the two-year period, and they won't be able to terminate him on the two-year ground. Other than that, we're left with the repeated incarceration ground. So I would propose that this is an end run, not knowing, can we get him on the incarceration grounds? If we don't know, let's end run it with the grounds that he somehow neglected his parental duties. And I would posit to this court, Your Honor, in response to the State's argument, the State's argument makes a lot of noise about his bad acts. Certainly, you could characterize the testimony about Mr. Curtis as making him unpopular. But realistically, there's a ground for that, and it's depravity. And the State could have alleged him depraved. All these beatings, all these convictions, all these things could have been brought to light in a depravity hearing, but that didn't occur. The State, once again, decided to go down a route that alleged that he was somehow neglectful of his parental duties. Choosing to do that must take into account his incarceration. If you're going to allege that somebody didn't follow through and then put them in an incarceration situation with access to no services, and I believe that this court's review of the record is going to show he was in the Bonn County Jail for the months preceding the time that he went to the Department of Corrections to serve his quote-unquote boot camp sentence. All his incarceration, though, was related to the way he treated the mother of his children. I mean, it wasn't because he had a burglary or something of that nature. Wouldn't it make more sense that you would consider the nature of the conviction and the underlying conduct? I'm just trying to say, you know, the two-year thing is here if you've got three burglaries. You know, this is something else. This is all directly related to the family situation. Certainly. Conceitedly, everything is related to his relationship with the mother. The point of the Juvenile Court Act is to take people whose kids get taken away from them because they are notably unpopular and make them better individuals. The idea of providing services through DCFS, the idea of providing these parenting classes, domestic finance classes, all the services that would have been provided under the service plan should have been able to perfect Mr. Curtis to the point that he would have been able to get these kids back into his care. Thank you. Thank you, Mr. Connor. Thank you, Mr. McCormick. Very interesting case. We'll take another five minutes.